**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| **AMERICAN UNIVERSITY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.: 1:07-cv-02114** |
| | ) | |
| **SPORTEXE CONSTRUCTION SERVICES,** | ) | |
| **INC.,** *et al,* | ) | |
| | ) | |
| **Defendants.** | ) | |

## ANSWER TO COMPLAINT BY SPORTEXE CONSTRUCTION SERVICES, INC.

Defendant, Sportexe Construction Services, Inc. ("Sportexe"), by counsel, for its Answer to the

Complaint of American University ("AU"), states as follows:

### FIRST DEFENSE

The Complaint fails to state a claim from which relief can be granted

### SECOND DEFENSE

1.      Sportexe admits AU filed the Complaint, states that the Complaint speaks for

itself, and denies that it breached any contract or warranty or engaged in any negligent act or

omission and therefore denies the remaining allegations in paragraph 1 of the Complaint.

2.      Sportexe admits it entered in to the Contract on or about July 15, 2004, states that

the Contract speaks for itself and denies the remaining allegations.

3.      Sportexe denies the allegations in paragraph 3 of the Complaint.

4.      The allegations in paragraph 4 relate to defendant Evergreen National Indemnity

Company ("Evergreen"), but Sportexe denies that it failed to perform the Contract or that

1

Evergreen was required to perform under the Performance Bond and therefore denies the allegations in paragraph 4 of the Complaint.

5.    Sportexe states that the Complaint speaks for itself, denies the allegations in paragraph 5 fully or accurately describes the claims asserted in the Complaint, denies any alleged failure by Sportexe to perform its obligations under the Contract.

6.    The allegations in paragraph 6 are jurisdictional in nature and require no response by Sportexe.

7.    Sportexe admits the allegations in the first sentence of paragraph 7 of the Complaint.  Further answering, Sportexe admits it is a leader in synthetic turf surfacing products for the sports industry, and that it has customers in this judicial district, but denies the remaining allegations in paragraph 7 as phrased.

8.    Sportexe states that Insight Equity Holdings, LLC has been dismissed and these allegations therefore require no response.

9.    Sportexe states that Insight Equity Holdings I, LLC has been dismissed and these allegations therefore require no response.

10.    The allegations in paragraph 10 of the Complaint relate to another defendant and require no response from Sportexe.

11.    The allegations in paragraph 11 are jurisdictional in nature and require no response by Sportexe.

12.    The allegations in paragraph 12 are jurisdictional in nature and require no response by Sportexe.

13.    The Insight Equity Entities have been dismissed and the allegations in paragraph 13 of the Complaint therefore require no response.

14.     The Insight Equity Entities have been dismissed and the allegations in paragraph 14 of the Complaint therefore require no response.

15.     The Insight Equity Entities have been dismissed and the allegations in paragraph 15 of the Complaint therefore require no response.

16.     The Insight Equity Entities have been dismissed and the allegations in paragraph 16 of the Complaint therefore require no response.

17.     The Insight Equity Entities have been dismissed and the allegations in paragraph 17 of the Complaint therefore require no response.  Further answering, Sportexe understands the name "Sportexe" as used in the Complaint to refer only to Sportexe Construction Services, Inc.

18.     Sportexe admits the allegations in paragraph 18 of the Complaint.

19.     Sportexe admits the allegations in paragraph 19 of the Complaint.

20.     Sportexe admits that the original Contract Sum was $1,371,735.00 and that the sum eventually increased to $1,577,960.49, not $1,576,807.86 as alleged in paragraph 20 of the Complaint.

21.     Sportexe states that the Contract speaks for itself and denies that paragraph 21 fully or accurately represents the agreements of the parties and therefore denies the same.

22.     Sportexe states that the Contract speaks for itself and denies that the allegations in paragraph 22 accurately paraphrase the terms of the Contract.

23.     Sportexe states that the specifications speak for themselves and contain the quoted language, but denies that the allegations in paragraph 23 fully or accurately state all the requirements of the Specifications.  Further answering, Sportexe affirmatively states that the condition of the subgrade was determined to be in compliance with the Specifications by

Sportexe's independent inspection agency, which verification was reviewed and accepted by AU's architect as satisfactory and in compliance with the terms of the Contract.

24.     Sportexe admits that paragraph 24 accurately quotes Subsection 3.06(B) of Section 02200 of the Specifications, but denies that this Subsection relates to the condition of the field or subgrade as alleged in the Complaint.

25.     Sportexe admits that it subcontracted with Sports Construction Group and other subcontractors to perform aspects of the work, but denies the truth of the remaining allegations in paragraph 25 of the Complaint.

26.     Sportexe admits the allegations in paragraph 26 of the Complaint.

27.     Sportexe admits the allegations in paragraph 27 of the Complaint.

28.     Sportexe admits paragraph 28 of the Complaint accurately quotes Section 9.2 of the Contract.

29.     Sportexe admits that it provided a Manufacturer's Limited Warranty on or about October 28, 2004, which document speaks for itself, but denies that paragraph 29 fully or accurately paraphrases the terms of Manufacturer's Limited Warranty.

30.     Sportexe admits the allegations in paragraph 30 of the Complaint.

31.     Sportexe denies the allegations in paragraph 31 of the Complaint.

32.     Sportexe admits the allegations in paragraph 32 of the Complaint.

33.     Sportexe admits that it received an email chain on or about April 10, 2006, which email speaks for itself.  Further answering, Sportexe denies the allegations in paragraph 33 of Complaint fully or accurately paraphrase the email forwarded to Sportexe.

34.     Sportexe denies the notice was provided in accordance with Section 3.5.2 of the General Conditions of the Contract and therefore denies the allegations in paragraph 34 of the Complaint.

35.     Sportexe admits that Mark Nichols visited the Project on or about January 4, 2007, but denies that he acknowledged any fault or liability of Sportexe for problems with the field and therefore denies the remaining allegations in paragraph 35 of the Complaint.

36.     Sportexe lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 36 of the Complaint.

37.     Sportexe states that the report issued by DMA speaks for itself and denies that the allegations in paragraph 37 fully or accurately paraphrase the conclusions of the report.

38.     Sportexe states that the report issued by DMA speaks for itself and denies that the allegations in paragraph 38 fully or accurately paraphrase the conclusions of the report.

39.     Sportexe states that the report issued by DMA speaks for itself and denies that the allegations in paragraph 39 fully or accurately paraphrase the conclusions of the report.

40.     Sportexe denies the allegations in the first three sentences of paragraph 40 of the Complaint, but admits that it did act in good faith and began, in the Spring of 2007, to evaluate the conditions of the field using various testing methods to determine potential remedies. Further, Sportexe admits that Mark Nichols is no longer president of Sportexe and that Sportexe issued a press release to this effect on October 1, 2007.  Further answering, Sportexe denies the remaining allegations in paragraph 40.

41.     Sportexe denies the allegations in paragraph 41 of the Complaint.

42.     Sportexe admits that AU sent a letter dated April 3, 2007, which letter speaks for itself, but Sportexe denies the truth of the remaining allegations, including specifically that it was in default under the Contract.

43.     Sportexe denies the allegations in paragraph 43 of the Complaint, but admits that it made two good faith attempts on May 17 and June 21, 2007 to evaluate potential remedies for damage to the field caused by AU.

44.     Sportexe admits that AU sent a letter dated July 6, 2007, which letter speaks for itself, but Sportexe denies the truth of the remaining allegations, including specifically that it was in default under the Contract.

45.     Sportexe denies that it was in default and therefore denies the allegations in paragraph 45 of the Complaint.

46.     Sportexe admits that it received a copy of a letter addressed to Evergreen, dated August 31, 2007, which letter speaks for itself.  Further answering, Sportexe denies it was in default and therefore denies the remaining allegations in paragraph 46.

47.     Sportexe denies any failure to perform the Contract and therefore the allegations in paragraph 47 of the Complaint.

48.     Sportexe denies the allegations in paragraph 48 of the Complaint.

COUNT I
(Breach of Contract Against Sportexe)

49.     In response to the allegations in paragraph 49 of the Complaint, Sportexe incorporates here its responses to the allegations in paragraphs 1-48 of the Complaint.

50.     Sportexe denies the allegations in paragraph 50 of the Complaint.

51.     Sportexe denies the allegations in paragraph 51 of the Complaint.

## COUNT II
### (Negligence Against Sportexe)

52.    In response to the allegations in paragraph 52 of the Complaint, Sportexe incorporates here its responses to the allegations in paragraphs 1-51 of the Complaint.

53.    Sportexe states that its obligations respecting the Project are set forth in the Contract, which speaks for itself.  Further answering, Sportexe denies the remaining allegations in paragraph 53 of the Complaint.

54.    Sportexe denies the allegations in paragraph 54 of the Complaint.

55.    Sportexe denies the allegations in paragraph 55 of the Complaint.

## COUNT III
### (Negligent Supervision Against Sportexe)

56.    In response to the allegations in paragraph 56 of the Complaint, Sportexe incorporates here its responses to the allegations in paragraph 1-55 of the Complaint.

57.    Sportexe denies that it contracted to provide all of the design and engineering services for the project and therefore denies the allegations in paragraph 57 of the Complaint.

58.    Sportexe denies the allegations in paragraph 58 of the Complaint.

59.    Sportexe denies the allegations in paragraph 59 of the Complaint.

## COUNT IV
### (Breach of Express Warranty Against Sportexe)

60.    In response to the allegations in paragraph 60 of the Complaint, Sportexe incorporates here its responses to the allegations in paragraphs 1-59 of the Complaint.

61.    Sportexe states that the Contract speaks for itself, denies that the allegations in paragraph 61 fully or accurately paraphrase the Contract, and therefore deny the allegations in paragraph 61 of the Complaint as phrased.  admits that it provided warranties to AU and states that these warranties speak for themselves.

62.     Sportexe admits that AU informed it of conditions respecting the field but denies those conditions were caused by matters within the scope of any applicable warranty and therefore deny the allegations in paragraph 62 of the Complaint.

63.     Sportexe denies the allegations in paragraph 63 of the Complaint.

64.     Sportexe denies the allegations in paragraph 64 of the Complaint.

## COUNT V
### (Breach of Implied Warranty Against Sportexe)

65.     In response to the allegations in paragraph 65 of the Complaint, Sportexe incorporates here its responses to the allegations in paragraphs 1-64 of the Complaint.

66.     Sportexe states that the Contract speaks for itself, denies the allegations in paragraph 66 accurately describe the Work for the Project, and therefore denies the allegations in paragraph 66 of the Complaint.

67.     Sportexe denies the allegations in paragraph 67 of the Complaint.

68.     Sportexe denies the allegations in paragraph 68 of the Complaint.

69.     Sportexe denies the allegations in paragraph 69 of the Complaint.

## COUNT VI
### (Breach of Contract Against Evergreen)

70.     In response to the allegations in paragraph 70 of the Complaint, Sportexe incorporates here its responses to the allegations in paragraphs 1-69 of the Complaint.

71.     Sportexe states that the Bond speaks for itself and denies the allegations in paragraph 71 of the Complaint as phrased.

72.     Sportexe admits that it received communications from AU respecting performance of the Contract, which communications speak for themselves.  Further answering,

Sportexe lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 72 concerning Evergreen and therefore denies the same.

73.    The allegations in paragraph 73 of the Complaint are not addressed to Sportexe and therefore do not require any responsive pleading.  To the extent that the allegations in paragraph 73 allege any failure by Sportexe to perform its obligations under the Contract, or assert AU has any right to recover under the Bond, they are denied.

74.    Sportexe denies the allegations in paragraph 74 of the Complaint.

75.    The allegations in paragraph 75 are not addressed to Sportexe, but Sportexe denies that it failed to perform its obligations under the Contract, or that  AU has any right to recover under the Bond, and therefore denies the allegations in paragraph 75 of the Complaint.

## FIRST AFFIRMATIVE DEFENSE

AU's claims are barred by the release contained in Section 3.12.2 of the Contract, which releases Sportexe from any and all suits, actions, legal proceedings, claims, demands, liabilities, costs and expenses to the extent directly or indirectly caused by an act, omission, fault or negligence, whether passive or active, of AU, or a party acting under AU's direction or control, or on its behalf.

## SECOND AFFIRMATIVE DEFENSE

AU is estopped from bringing its claims against Sportexe because the damage to the field was caused in whole or in part, directly or indirectly, by the active or passive acts, omissions, fault or negligence of AU or a party acting under its direction or control or on its behalf, including its architect and engineer, and AU is required by Section 3.12.2 of the Contract to indemnify, defend, and hold harmless Sportexe from any and all claims and actions.

### THIRD AFFIRMATIVE DEFENSE

AU's claims are barred by the intervening or superseding acts, omissions, fault or negligence of AU, or a party acting for or on AU's behalf, which acts, omissions, faults, or negligence were the proximate cause of any damages sustained by AU.

### FOURTH AFFIRMATIVE DEFENSE

AU's warranty claims are barred because it failed to give timely notice as required by the Contract.

### FIFTH AFFIRMATIVE DEFENSE

AU's claims are barred by AU's improper cleaning and maintenance of the field, including the use of improper equipment, which acts voided the warranties and/or bars recovery under the warranties.

### SIXTH AFFIRMATIVE DEFENSE

Count V of the Complaint is barred because the Contract expressly disclaims all implied warranties.

### SEVENTH AFFIRMATIVE DEFENSE

Count V of the Complaint fails to state a claim upon which relief can be granted or is otherwise barred because the law implies no warranty that the turf would be laid and constructed in a manner "sufficient for the Project's intended purpose."

### EIGHT AFFIRMATIVE DEFENSE

Counts II and III of the Complaint fail to state a claim on which relief can be granted or are otherwise barred because Sportexe and AU entered into a contractual relationship and the remedy for an alleged performance failure lies in contract, not in an action in tort.

### NINTH AFFIRMATIVE DEFENSE

If Sportexe is found to be negligent, any damages sustained by AU are barred by AU's contributory negligence, or the contributory negligence of a party acting for or on AU's behalf.

### TENTH AFFIRMATIVE DEFENSE

AU is estopped from bringing an action on the Performance Bond because AU failed to fulfill all of the requirements that are conditions for making a demand on the Performance Bond.

### COUNTERCLAIM BY SPORTEXE CONSTRUCTION SERVICES, INC.

Defendant Sportexe Construction Services, Inc. ("Sportexe"), by counsel, pursuant to Fed. R. Civ. P. 13(a)(1), states as follows for its Counterclaim against American University ("AU"):

### Jurisdiction

1.      This Court has jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1332(a)(1), in that the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.  Additionally, this is a compulsory Counterclaim under Rule 13 of the Federal Rules of Civil Procedure.

### AU's Architects and Engineers Prepared the Specifications for the Field

2.      Sportexe entered into a construction contract (the "Contract") with American University ("AU") on or about July 15, 2004 for a project (the "Project") that included the construction (the "Work" as defined in the Contract) of a synthetic turf field (the "Field").  The Contract incorporated by reference several other documents, including the Bid Specifications Multi-Purpose Artificial Turf and Intramural Field Restoration Project for American University dated May 26, 2004 (the "Specifications").

3.     The Specifications were prepared by architects and engineers employed by AU. AU did not rely on Sportexe to design or specify the materials or methods for excavation, fill, or compaction of the sub-grade used for the Field. All of those requirements were selected by AU's architects and engineers, and AU required that the Field be built to its Specifications.

4.     There were options with respect to the materials to be used to construct the Field's sub-grade. The sub-grade design specified by AU limited the load capacity of the Field when completed.

5.     For example, an asphalt sub-grade would have provided a stronger base with a higher load bearing capacity. The Field had an inherently lower load bearing capacity because of the design and materials selected by AU and its architects and engineers.

6.     The Specifications developed by AU's architects and engineers not only stipulated the types of materials to be used for the sub-grade of the Field, but designated the processes and methods of the excavation and grading of the site, the processes and methods for the preparation of the sub-grade, and the maintenance of the Field's sub-grade.

### Sportexe Constructed the Field in Accord with AU's Requirements

7.     Sportexe's subcontractors excavated, filled, compacted, and maintained the Field's sub-grade using the materials, methods, and design required by AU in the Specifications.

8.     Section 3.04 of the Specifications required that the acceptability of the Field's sub-grade, including the type and compaction of the fill, be verified by an independent inspection agency.

9.     With AU's full knowledge and acceptance, Sportexe employed Burgess & Niple, Inc. ("B & N"), an independent inspection agency, to observe the construction progress and

12

conduct geotechnical tests to verify that the sub-grade material and compaction was consistent with the requirements of the Specifications.

10.     Between September 23, 2004 and November 11, 2004, B & N extensively tested the Field's sub-grade for conformity with the Specifications.  Any area that did not meet the requirements of the Specifications was reworked and retested.  B&N issued a report, supported by its field notes and testing data, including its field density test results, stating that its observations and testing indicated the work was performed in general accordance with the Project requirements.

11.     Article 4 of the Contract provides that AU's Architect will administer the contract.  Among other duties, AU's Architect was required by Section 4.2 to "visit the site at intervals appropriate to the state of construction to become generally familiar with the progress and quality of work."  Section 4.5 provides "[t]he Architect will have authority to reject the Work that does not conform to the Contract Documents."

12.     AU's Architect, the Owner's Representative, and other AU employees and representatives, actively participated in observing the construction of the Work, verifying that the Work was performed in accordance with the Specifications, directing changes to the scope of the Work, and otherwise overseeing the progress of the Work by Sportexe and its sub-contractors.

13.     Article 7.6.1 of the Contract specifies that the final payment for the Project will be approved after the Architect and Owner have inspected the Work and the Owner's Representative finds the Work acceptable and the Contract fully performed.

14.     AU's Architect reviewed the testing methodology, test results, and conclusions of B&N that the construction of the sub-grade complied with the requirements of the Contract.  The Architect did not reject any of the work on the sub-grade.  Rather, after inspection by the Owner

and Architect, the Owner's Representative accepted the Work and authorized final payment to Sportexe for performance of the Contract.

15.    Further, there is no specific factual allegation in AU's Complaint that the fill material used in the sub-grade did not comply with the Specifications; that the method of compacting the fill was not in accord with the Specifications; that the soil moisture content and compaction required by the Specifications were not achieved; that the sub-grade otherwise failed to fulfill any particular requirement of the Specifications; or that AU, AU's Architect, the Owner's Representative, or others acting on behalf of AU could not reasonably have detected any such failure to conform to the requirements of the Specifications in a timely manner.

16.    AU and its representatives undertook to inspect samples of the turf and elayer used to construct the Field. These samples were approved by AU.

17.    There is no specific factual allegation in AU's Complaint that either the turf or elayer installed during construction of the Field failed to conform in any respect to the samples that were provided to and approved by AU, or that the turf and elayer installed failed to conform to any of the other requirements of the Contract. Nor is there an allegation in the Complaint that AU, AU's Architect, the Owner's Representative, or others acting on behalf of AU could not reasonably have detected any such failure to conform to the requirements of the Specifications in a timely manner.

**AU Negligently Used A Sweeper<br>Exceeding the Load Limitations Of The Field**

18.    AU, or a party acting under its direction or control, or on its behalf, purchased and routinely employed a Model 6400 Tennant sweeper (the "Sweeper") for the cleaning and maintenance of the Field.

19.    AU habitually employed the Sweeper by driving it lengthwise on the field in a manner such that the Sweeper's tires followed the same path each time.  AU employed the Sweeper to clean the Field in this manner as often as several times a day.

20.    After repeated use of the Sweeper in the manner described above, AU noticed that the Field began to develop lengthwise ruts and ridges in the same pattern as was used by the Sweeper for maintenance of the field.  Nevertheless, AU continued to use the Sweeper in the same manner.  Over time, the condition of the Field worsened.

21.    The weight of the tenant Sweeper and the applicable pounds of force per square inch ("PSI") exerted by the Sweeper's tires grossly exceeded the load bearing capacity of the Field.

22.    Tennant's website lists the Sweeper's net weight as 2,300 pounds.  Tennant's website lists the Sweeper's debris hopper as having a weight capacity of 700 pounds.

23.    On July 13, 2006, Tennant provided AU with a letter detailing the PSI of each of the Sweeper's three tires, both empty and with the debris hopper loaded to 750 lbs.  Tennant's letter states that the front left tire ranged from 76 PSI empty to 109 PSI loaded; the front right tire ranged from 66 PSI empty to 94 PSI loaded; and the rear tire ranged from 88 PSI empty to 111 PSI loaded.

24.    The maximum transient rolling load for the Field should not exceed 35 PSI.  Each time AU employed the Sweeper in the maintenance of the Field, the Sweeper exerted a force in excess of two to three times the maximum appropriate tire load.

25.    AU continued to employ the Sweeper even after it became evident that use of the Sweeper was damaging to the field, thereby exacerbating the damage to the field, potentially requiring a complete replacement of the Field instead of repair.

26.    AU, or those acting on its behalf, knew or should have known that the Sweeper was substantially out of compliance with the maximum load limits for the Field.

## COUNT I

27.    Sportexe repeats and realleges, as if fully set forth herein, all of the allegations contained in paragraphs 1 to 26.

28.    The damage to the Field was caused, occasioned or contributed to by reason of the direct or indirect, active or passive acts, omissions, fault, or negligence of AU, or of someone acting under its direction or control, or on its behalf.

29.    AU has released Sportexe from all suits, actions, legal proceedings, claims, demands, liabilities, attorney's fees, costs and expenses to the extent directly or indirectly caused or claimed to be caused, occasioned, or contributed to by reason of any act, omission, fault or negligence, whether active or passive, of the AU, or anyone action under its control or direction, or on its behalf.

30.    AU's release, and its promise to indemnify, defend and hold harmless Sportexe, is set out in Article 3.12.2 of the Contract as follows:

> To the fullest extent permitted by law, the Owner ("Indemnifying Party") hereby releases and shall indemnify, defend and hold harmless the Contractor, its subsidiaries and affiliates, and the officers, agents, employees, successors and assigns and authorized representatives of all the foregoing (the "Indemnified Party") from and against any and all suits, actions, legal or administrative proceedings, claims, demands, liabilities, interest, attorney's fees, costs and expenses of whatsoever kind or nature including those arising out of injury or death to the Owner's employees, whether arising before of after completion of this Agreement, to the extent directly or indirectly caused or claimed to be caused, occasioned or contributed to by reason of any act, omission, fault or negligence, whether active or passive, of the Owner or of anyone acting under its direction or control or on its behalf in connection with or incidental to the performance of this Agreement.

31.     AU materially breached Article 3.12.2 by filing this action against Sportexe and the other defendants when it knew or should have known that the damages to the Field was directly or indirectly caused, occasioned, or contributed to by reason of an act, omission, fault or negligence, both active and passive, of AU or persons acting under its control or direction, or on its behalf.

32.     The direct and indirect acts, omissions, fault or negligence, either active or passive of AU and persons acting under its control or direction, or on its behalf, include, but are not limited to, the following:  (i) the Specifications for the Work; (ii) the administration of the Contract; (iii) the inspection and oversite of the Work by AU and its architects and the Owner's Representative; (iv) AU's use of a Sweeper that overloaded the Field; and (v) AU's continued use Sweeper for an extended period of time after it knew or should have know that damage was occurring to the Field.

33.     As a direct, proximate, and foreseeable consequence of AU's material breach of contract, Sportexe has had to retain counsel to defend this action, both for itself, and for Evergreen National Indemnity Company, which Sportexe is required to indemnify under the terms of the Performance Bond, as AU knew or should have known at the time it wrongfully filed this action.  In addition, Sportexe has had to incur the cost of retaining experts to assist in the defense of this action, and will incur other costs associated with the defense of the action, all of which have been and will continue to be incurred as the proximate and sole cause of AU's breach of contract.  Additionally, Sportexe's professional reputation has been damaged, and will likely be substantially and further damaged by AU's acts and omissions as this action procedes, all of which damage is the proximate and foreseeable cause of AU's breach of contract.

## PRAYER FOR RELIEF

WHEREFORE, Sportexe respectfully requests entry of judgment in its favor and against

Plaintiff American University for:

1.    Damages suffered by Sportexe from its loss of reputation in an amount to be

determined by the Court;

2.    All attorneys fees, expert witness fees, costs and other expenses incurred by

Sportexe in both its defense of this case and its representation of Evergreen; and

3.    Such other and further relief as the Court may deem just and equitable.

## Demand for Jury Trial

Sportexe demands trial by jury on its Counterclaim.


Sportexe Constructions Services, Inc.


Dated: January 7, 2008                    By:_____/s_____
                                                        Counsel


Mark B. Bierbower (D.C. Bar #32861)
John Jay Range (D.C. Bar #37608)
HUNTON & WILLIAMS, LLP
1900 K Street, N.W.
Washington, D.C.  20006-1109
(202) 955-1500
(202) 778-2201 (fax)
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of January, 2008, one copy of the foregoing Unopposed Motion for Extension of Time and Accompanying Statement of Points and Authorities was served through the Electronic Case Filing System upon the following:

James S. Kurz (D.C. Bar #349100)
Virginia W. Hoptman
Erin L. Roberts
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
8065 Leesburg Pike, Fourth Floor
Tysons Corner, Virginia 22182-2738
(703) 394-2230
*Counsel for Plaintiff American University*

_____/s_____